UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br>100 F. Street, NE<br>Washington, D.C. 20549-6030<br><br>    Plaintiff,<br><br>  v.<br><br>TEXTRON INC.<br>40 Westminster Street<br>Providence, RI 02903<br><br>    Defendant. | Civil Action No. _____ |

## COMPLAINT

Plaintiff, U.S. Securities and Exchange Commission (the "Commission"), alleges that:

### SUMMARY

1.   From approximately 2001 through 2003, Textron Inc. ("Textron") violated the books and records and internal controls provisions of the Foreign Corrupt Practices Act (the "FCPA") when two of its French subsidiaries authorized and made approximately $650,539 in kickback payments in connection with its sale of humanitarian goods to Iraq under the United Nations ("U.N.") Oil for Food Program. Textron's French subsidiaries authorized and paid kickbacks to Iraq in the form of "after-sales service fees" on sales of its products to Iraq. Textron knew or was reckless in not knowing that kickbacks were paid in connection with those transactions. Textron knew

that such payments were prohibited by the Oil for Food Program and U.S. and international trade sanctions on Iraq.

2. The Oil for Food Program provided humanitarian relief to the Iraqi population during the time that Iraq was subject to international trade sanctions. The program required that Iraq could purchase necessary humanitarian goods and related services through a U.N. escrow account. However, the kickbacks paid in connection with Textron's subsidiaries' sale of goods to Iraq bypassed the escrow account and were instead paid by third parties to Iraqi-controlled accounts at banks in countries such as Lebanon.

3. Textron's subsidiaries also made illicit payments in violation of the books and records and internal controls provisions of the FCPA in certain other countries during the 2001 to 2005 time period. These payments totaled approximately $114,995.

4. In paying "after-sales service fees" to Iraq outside of the confines of the U.N. program and in making payments in certain other countries that were violative of the FCPA, Textron failed to accurately record in its books and records the kickbacks that were authorized for payment to Iraq and the illicit payments made in certain other countries. Textron also failed to devise and maintain a system of internal accounting controls to detect and prevent such illicit payments.

5. As a result of this conduct, Textron violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## JURISDICTION

6.  This Court has jurisdiction over this action under Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. Textron, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

7.  Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Textron does business in this judicial district and certain acts or transactions constituting the violations by Textron occurred in this district.

## DEFENDANT

8.  Textron is a Delaware corporation with its headquarters in Providence, Rhode Island. Textron is a global, multi-industry company that operates in four business segments. Its Industrial Segment is comprised of numerous subsidiaries, including several under the name "David Brown." Two of the David Brown subsidiaries sold goods to Iraq under the Oil for Food Program. Textron's common stock is registered with the Commission pursuant to Section 12(b) [15 U.S.C. § 78l(b)] of the Exchange Act and is traded on the New York Stock Exchange under the symbol "TXT."

## RELEVANT ENTITIES

9.  **Union Pump S.A.S., formerly known as David Brown Guinard Pumps S.A.S.** ("DB Guinard Pumps"), acquired by Textron in December 1999, is a wholly-owned fifth-tier French subsidiary of Textron that is part of the company's Industrial Segment. DB Guinard Pumps manufactures industrial pumps for the oil, gas and petrochemical industries. DB Guinard Pumps is located in Annecy, France.

10. **David Brown Transmissions France S.A.** ("DB Transmissions France"), acquired by Textron in November 1998, is a wholly-owned fifth-tier French subsidiary of Textron that is part of the company's Industrial Segment. DB Transmissions France designed and manufactured industrial gears, transmissions and other items. DB Transmissions France was located in Chassieu, France.

## FACTS

### I.   The United Nations Oil for Food Program

11. On August 2, 1990, the government of Iraq, under Saddam Hussein, invaded Kuwait. Four days later the United Nations Security Council voted to enact U.N. Resolution 661, which prohibited member states from trading in any Iraqi commodities or products. The United Nations continued to enforce these sanctions until 2003.

12. On April 14, 1995, the United Nations Security Council adopted Resolution 986, which authorized the Government of Iraq to sell oil on the condition that the proceeds of all of its oil sales be deposited in a bank account monitored by the United Nations and used only to purchase designated humanitarian goods for the benefit of the Iraqi people. In May 1996, the Government of Iraq entered into a written Memorandum of Understanding to implement Resolution 986.

13. The United Nations Office of Iraq Program, Oil for Food (the "Oil for Food Program" or "Program") was subsequently established to administer Iraq's sale of oil and purchase of humanitarian goods by Iraq. A special bank account was established at a bank in New York (the "UN Escrow Account") to handle the transactions. The United Nations' economic sanctions on Iraq remained in place for all trade and transactions not authorized by the Oil for Food Program.

14. Starting in the middle of 2000, the Iraqi government made a concerted effort to subvert the Program by demanding secret kickbacks from its humanitarian goods suppliers. Although contracts entered into pursuant to the Program were subject to UN review and approval, the Program gave Iraq discretion to select the companies from which it purchased goods. A humanitarian supplier would submit a bid for the sale of its goods. After the Iraqi ministry would accept the bid, the ministry would inform the supplier of the requirement that the supplier make a secret payment in the form of an "After-Sales Service Fee" ("ASSF") to Iraq in order to win the contract. The Iraqi ministry would also inform the supplier that the ASSF would have to be paid prior to the goods entering into the country, or the goods would be stopped at the border until the ASSF payment was paid.

15. Initially, when this scheme first began, suppliers met with the Iraqi ministries in person and signed a side agreement acknowledging that the supplier would make the illicit payment.[1] By October 2000, this fee was usually ten percent of the total contract value. Later in the scheme, everyone understood that the ten percent would have to be paid. Thus, side agreements were no longer needed -- the supplier would simply increase its original contract bid by ten percent.

16. The supplier would then submit its contract with the inflated contract price to the UN for approval, and not disclose the ten percent illicit payment, which was in violation of the Program rules. The supplier would pay the ASSF to Iraq prior to shipping its goods. Afterwards, the UN Escrow Account would pay the supplier the inflated contract price for the goods, thus, unknowingly reimbursing the supplier for the

---

[1] The side agreement was not provided to the UN when the Oil for Food contract was submitted and approved. This was in violation of the Program and U.S. and international trade sanctions against Iraq.

ten percent that the supplier had already provided to Iraq. As a result of this conduct, the UN Escrow Account lost the benefit of more than $1 billion.

17. After the United States invaded Iraq in March 2003, at the request of the provisional government, the UN ceased Iraq's ASSF scheme. The UN required that all pending contracts that had been inflated by ten percent be amended to reflect the true contract value of the goods.

## II. Textron Subsidiaries Make Illicit Payments to Iraq

18. The companies in Textron's Industrial Segment design and manufacture products such as industrial gears, mechanical transmission systems, industrial pumps, and valves. Two of Textron's French subsidiaries utilized consultants in the Middle East to facilitate sales of industrial pumps and gears to Iraq under the Oil for Food Program. Textron subsidiaries DB Guinard Pumps and DB Transmissions France made illicit ASSF payments through these consultants. Textron's profits from contracts in which ASSF payments were made were $1,936,926.

### A. DB Guinard Pumps Authorizes Payment of Approximately $83,000 in Illicit ASSF Payments

19. During the Program, DB Guinard Pumps conducted business in Iraq with the help of a Lebanese consulting firm ("Consultant A"). Despite company policy that all such non-U.S. intermediary agreements be reduced to writing, DB Guinard Pumps did not enter into a written contract with Consultant A.

20. With the approval of DB Guinard Pumps' Sales Manager for the Middle East ("DB Sales Manager"), Consultant A negotiated and signed three sales contracts with Iraq's Ministry of Oil for the sale of industrial pumps. The General Manager of Consultant A signed the sales contracts as "Commercial Manager" of DB Guinard

6

Pumps. In connection with these contracts, DB Guinard Pumps agreed to make ASSF payments amounting to ten percent of the contract price. The sales contracts, containing prices inflated by ten percent to cover the cost of the illicit ASSF payments, were submitted to the UN for processing and approval. The contracts did not disclose that the cost of the illicit ASSF payments were included in the inflated contract price. With the approval and knowledge of the DB Sales Manager, Consultant A then entered into separate written side agreements for each sale with the Iraqi ministry. Pursuant to these side agreements, Consultant A agreed to pay the illicit ASSF on behalf of DB Guinard Pumps prior to receipt of the goods at Iraq's border. Consultant A then invoiced DB Guinard Pumps for "consultation fees," including the amount of the ASSF payments, and passed the funds along to Iraq. DB Guinard Pumps was later reimbursed for the ASSF payments when it received payment from the UN for the inflated sales contract.

21.    In connection with two of the sales contracts, DB Guinard Pumps paid more than $48,000 in illicit ASSF payments to Iraq's Ministry of Oil through the consultant. DB Guinard Pumps authorized, but did not pay, an additional $35,000 in illicit ASSF payments in connection with the third sales contract.[2]

22.    Copies of DB Guinard Pumps internal forms show French management approval of ASSF payments on two of the DB Guinard Pumps transactions. Each form, known as a "Bon de Commission," was generated by DB Guinard Pumps' Finance Department and signed by the Sales and Finance Directors in Annecy. The Bon de Commission documents request authorization to pay the amount of the ASSF to the consultant. The documents contain the term "side agreement" and show that Consultant

---

[2]    Because the sale was not completed and the ASSF was not paid by the time of the U.S. invasion of Iraq in March 2003, the UN required that DB Guinard Pumps amend the contract, lowering its price to remove the ASSF in order to process the contract.

A was to receive fifty percent of the ASSF amount at the time a letter of credit on the UN contract was opened by the UN's bank and the remainder two weeks before delivery of the goods to Iraq. The payment of the ASSFs were described as consultation fees and recorded as commission payments to Consultant A in DB Guinard Pumps' books and records.

23. During one shipment to Iraq, the delivery of goods was held up at the Iraqi border due to non-payment of the ASSF. Upon learning from the shipper of the need for proof of the payment of ASSF, an employee at DB Guinard Pumps obtained such proof from Consultant A so that the goods could be unloaded at the border. Consultant A produced to DB Guinard Pumps bank records showing that, on June 17, 2002, Consultant A transferred $6,160.53 in ASSF payments into a Lebanese bank account in the name of an Iraqi individual for the benefit of the Iraqi ministry.

**B. DB Transmissions France Authorizes Approximately $567,000 in Illicit ASSF Payments Through Its Consultant**

24. During the Program, DB Transmissions France conducted business in Iraq with the help of a Jordanian consulting firm ("Consultant B"). DB Transmissions France did not have a written contract with Consultant B as required by company policy. The Export Sales Manager for the Middle East and responsible for such sales at DB Transmissions France worked closely with Consultant B to negotiate business with the Iraqi government.

25. In July 2000, after learning from the Iraqi Ministry of Industry of the new requirement that secret payments be made to do business in Iraq through the use of ASSF payments, the Export Sales Manager drafted a memo to Consultant B and sent copies to

8

his supervisors in France. The memo evidences the Export Sales Manager's understanding that the ASSF payments were not authorized under the UN Program, as he noted that DB Transmissions France wishes "to avoid any written agreement [concerning the ASSF] with client side" and "[i]f written document cannot be avoided, this must remain highly confidential." The Export Sales Manager also noted in his memo that he discussed this issue with French management and received approval from his superiors to include the amount of the ASSF in the inflated contract price submitted to the UN.

26.    Between January and July 2001, the Export Sales Manager signed ten sales contracts with the Iraqi Ministry of Industry and Minerals. In connection with these sales, DB Transmissions France agreed to make illicit ASSF payments. For each contract, the Export Sales Manager drafted a "Memorandum of Understanding" that set forth the obligations of DB Transmissions France and Consultant B with respect to the ASSF payment. In connection with each of the transactions, Consultant B paid the ASSF to the relevant Iraqi Ministry from its own account. Consultant B then invoiced DB Transmissions France for "After-Sales Service Fees" in the amount of the illicit ASSF payment.[3] These memoranda were signed by the Export Sales Manager on behalf of DB Transmissions France and by Consultant B. The payment of the ASSF was recorded as commissions to Consultant B in the company's books and records.

27.    Prior to the March 2003 invasion of Iraq, DB Transmissions France made more than $531,000 in illicit ASSF payments through the consultant in connection with

---

[3]    Consultant B submitted a separate invoice to DB Transmissions France for commissions.

nine Program contracts. DB Transmissions France authorized, but did not pay, an additional $35,000 in connection with a tenth sales contract.[4]

### III. TEXTRON SUBSIDIARIES MAKE OTHER ILLICIT PAYMENTS TO SECURE BUSINESS

28. Textron found thirty-six transactions involving illicit payments totaling $114,995.20 in countries other than Iraq. All of these payments were made by or facilitated by Textron's "David Brown" subsidiaries in its Industrial Segment. These illicit payments were similar to the ASSF payments Textron made under the Oil for Food Program because no bona fide services were actually performed and the payments were made to secure contracts. These payments were discovered by Textron during its internal investigation into the Oil for Food payments.

### A. DB Guinard Pumps Makes Improper Payments in the United Arab Emirates ("UAE")

29. Between 2002 and 2005, DB Guinard Pumps made twenty-three illicit payments totaling $20,429.06 to employees of two different oil companies, GASCO and ZADCO, which are both subsidiaries of the Abu Dhabi National Oil Company. In connection with DB Guinard Pump's sales to the UAE, approximately $14,000 was paid to employees of GASCO, and approximately $6,000 was paid to employees of ZADCO. The David Brown representative for the UAE made an additional illicit payment of $3,000 to an employee of ADCO, which is also a subsidiary of the Abu Dhabi National Oil Company. The total illicit payments in the UAE were $23,429.06. Textron's net profits from the sales involving these illicit payments were $158,002.

---

[4] Because the sale was not completed and the ASSF payment was not made by the time of the U.S. invasion of Iraq in March 2003, the UN required that DB Transmissions France amend the contract, lowering its price to remove the ASSF in order to process the contract.

### B. DB Guinard Pump's Makes Illicit Payments in Bangladesh

30. From 2001 to 2005, a representative engaged by DB Guinard Pumps made seven payments totaling approximately $16,342.14 to two "friends" employed by a government-owned fertilizer company in Bangladesh in connection with the sale of spare parts. Textron's net profits from the sales involving the illicit payments were $93,396.

### C. David Brown Union Pump's Representative in Indonesia Makes an Illicit Payment

31. David Brown Union Pump engaged an Indonesian representative to sell spare parts to Pertamina, an Indonesian government entity. The total contract price for this transaction was $321,171, with approximately $149,000 allocated for after-sales services.[5] Thus, almost half of the contract value was for after-sales services, which was highly unusual. Under the terms of the agreement, the representative would provide after-sales services on the goods, the cost of which was included in the price to Pertamina. In January 2002, the representative was paid $149,822, including a commission of $17,250 with the remainder allocated for after-sales service fees.

32. The representative paid approximately $10,000 to a procurement official at Pertamina to help sponsor a golf tournament. There are some receipts concerning the tournament sponsorship and very little documentation to show what the representative actually did with the remainder of the funds allocated for after-sales services. Textron's net profits from the sales involving the illicit payments were $52,032.

---

[5] There are legitimate after-sales services that may be rendered on a contract, for example, installation and repair.

11

    **D.**    **David Brown's Representative Makes Illicit Payments in Egypt and India**

    33.    In 2004, David Brown's representative in Egypt made three illicit payments totaling approximately $13,354 to a government customer in connection with the sale of gears and parts from a David Brown facility in the United Kingdom. The payments were disguised as "commissions" on sales of spare parts, and recorded as commissions. Textron's net profits from the sales involving the illicit payments were $25,509.

    34.    In 2002, David Brown's representative in India made an illicit payment totaling approximately $51,870 to a non-government customer to secure business. The payment was disguised as a "commission," and recorded as a commission. Textron did not profit on this transaction.

**IV.**    **Textron's Failure to Maintain Adequate Internal Controls**

    35.    Textron failed to maintain a system of internal controls sufficient to ensure that the company's transactions under the Oil for Food Program and in other countries were executed in accordance with management's authorization and to maintain accountability for the company's assets. As discussed above, Textron's subsidiaries made numerous illicit payments that contravened the Oil for Food Program, U.S. and international trade sanctions, and its own internal FCPA and anti-bribery policies. In addition, Textron's subsidiaries made a number of illicit payments in the UAE, Bangladesh, Indonesia, Egypt, and India that contravened Textron's internal FCPA and anti-bribery policies.

    36.    DB Guinard Pumps and DB Transmissions France failed to enter into signed agreements with non-U.S. intermediaries despite Textron requirements that they

12

do so, and management of the David Brown subsidiaries failed to report known transgressions to higher level managers. Further, although Textron knew of endemic corruption problems in the Middle East, it appeared to take on faith, without adequate confirming steps, that its managers and employees were exercising their duties to manage and comply with compliance and control issues. Textron failed to devise and maintain an effective system of internal controls to prevent or detect these violations of the FCPA, as required by Exchange Act Section 13(b)(2)(B).

V.   **Textron's Failure to Properly Maintain Its Books and Records**

37.   As described above, Textron's accounting for its Oil for Food transactions failed properly to record the nature of the company's subsidiaries' illicit payments. In twelve transactions, a portion of the subsidiaries' sale price for goods to Iraq constituted ASSF payments in violation of UN regulations and trade sanctions, and also Textron's FCPA and anti-bribery policies. The company's subsidiaries' failed to properly designate those payments, characterizing them instead as commissions to the consultants who worked on the transactions.

38.   Textron's subsidiaries also failed to accurately designate the illicit payments they made in certain other countries by characterizing them as commissions and consultation fees. Thus, Textron failed to accurately record these payments in its books, records, and accounts to fairly reflect the transactions.

## CLAIMS FOR RELIEF

### FIRST CLAIM

[Violations of Section 13(b)(2)(A) of the Exchange Act]

39.   Paragraphs 1 through 38 are realleged and incorporated by reference.

40. As described above, Textron, through its officers, agents, consultants, representatives, and subsidiaries, failed to keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

41. By reason of the foregoing, Textron violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## SECOND CLAIM

### [Violations of Section 13(b)(2)(B) of the Exchange Act]

42. Paragraphs 1 through 41 are realleged and incorporated by reference.

43. As described above, with respect to illicit payments made in connection with Textron's sales to Iraq and in certain other countries, Textron failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) payments were made in accordance with management's general or specific authorization; and (ii) payments were recorded as necessary to maintain accountability for its assets.

44. By reason of the foregoing, Textron violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

A. Permanently restraining and enjoining Textron from violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and (B)];

  B.  Ordering Textron to disgorge ill-gotten gains, with prejudgment interest, wrongfully obtained as a result of its illegal conduct;

  C.  Ordering Textron to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

  D.  Granting such further relief as the Court may deem just and appropriate.

Dated: August 23, 2007

              Respectfully submitted,

              _____
              Cheryl J. Scarboro (D.C. Bar No. 422175)
              Tracy L. Price
              Kelly G. Kilroy

              Attorneys for Plaintiff,
              U.S. Securities and Exchange Commission
              100 F Street, NE
              Mail Stop 6030 SPII
              Washington, DC 20549-6030
              (202) 551-4403 (Scarboro)

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-6030

## DEFENDANTS

Textron Inc.
40 Westminster Street
Providence, RI 02903

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Providence County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

## (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Cheryl J. Scarboro, Esq., Tracy L. Price, Esq., Kelly G. Kilroy, Esq.
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-6030
(202) 551-4403 (Scarboro)

## ATTORNEYS (IF KNOWN)

Timothy L. Dickinson, Esq.
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005
(202) 551-1858

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ⦿ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ⦿ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ⦿ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ○ A. Antitrust
☐ 410 Antitrust

### ○ B. Personal Injury/Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review
☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ⦿ E. General Civil (Other)   OR   ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
- ● 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
See Attachment A

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complaint
JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  8-23-07    SIGNATURE OF ATTORNEY OF RECORD  _[signature]_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

Civil Cover Sheet Attachment A

**U.S. Securities and Exchange Commission v. Textron Inc.**

**VI. Cause of Action**

This case is filed under the following civil statutes: 15 U.S.C. § 78u(d) - (e) (2006), and 15 U.S.C. § 78aa (2006).

This action arises from the defendant's violations of the following provisions of the Federal Securities laws: Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 [15 U.S.C. § 78m(b)(2)(A) and 15 U.S.C. § 78m(b)(2)(B)